John A. McCarthy, Appellant, v. William Wirt Mills, as Commissioner of Plant and Structures of The City of New York, and Others, Respondents.

First Department, July 6, 1925.

Municipal corporations — taxpayer's action to restrain letting contracts for construction of garbage destructor plant on exterior or marginal street in New York city — marginal or exterior street on west side of East river can, under Greater New York charter, §§ 819 and 819-a, be used only for commercial purposes to which wharves, docks, piers, etc., are devoted — power to erect said plant at place in question is not found in Greater New York charter, §§ 534, 542 and 836 — even if commissioner of docks, under Greater New York charter, § 836, would, with approval of commissioners of sinking fund, have power to devote said street to said purpose, consent was not legally given since comptroller did not vote.

The erection of a garbage destructor plant on a marginal or exterior street on the west side of the East river in New York city, will be restrained in a taxpayer's action, for, under sections 819 and 819-a of the Greater New York charter, the only use that can be made of a marginal or exterior street is a commercial use to which wharves, docks and piers are devoted, and in connection with which such streets are to be used.

Since the city has no power to grant the use of marginal or exterior streets for non-commercial purposes not connected with wharves, docks or piers, the

city itself cannot appropriate and use any such marginal streets or any part or portion thereof for non-commercial purposes not connected with the adjacent wharves and piers.

Power to erect the destructor plant in question is not found in sections 534, 542 and 836 of the Greater New York charter.

Even though it were to be held that the commissioner of docks had the power under section 836 of the Greater New York charter, with the approval of the commissioners of the sinking fund given under section 818 of the Greater New York charter, to erect the destructor plant at the point in question, the power cannot be legally exercised in this case, since it appears that the consent of the commissioners of the sinking fund was not legally given because of the fact that the comptroller, who was present at the time at which approval or consent was given, did not vote thereon.

BURR, J., dissents.

APPEAL by the plaintiff, John A. McCarthy, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 3d day of June, 1925, resettling an order entered in said clerk's office on the 2d day of June, 1925, denying plaintiff's motion for an injunction *pendente lite* and vacating a temporary injunction heretofore granted herein, enjoining and restraining the defendants from awarding four contracts for the construction of an incinerator or destructor plant, on the marginal way or exterior street, on the west side of the East river between Rivington street on the south, Stanton street on the north and Tompkins street on the west, and from entering into written contracts therefor.

*Kellogg & Rose [Franklin Nevius* of counsel; *MacIntosh Kellogg* and *William H. O'Brien* with him on the brief], for the appellant.

*George P. Nicholson, Corporation Counsel [Willard S. Allen* of counsel; *John F. O'Brien, Elliot S. Benedict* and *Josiah A. Stover* with him on the brief], for the respondents.

DOWLING, J.:

The complaint herein sets forth the following facts, among others. Plaintiff is a taxpayer of the city of New York. (See General Municipal Law, § 51.)

In and by section 819 of the Greater New York charter (Laws of 1901, chap. 466, as amd. by Laws of 1913, chap. 327) it is provided that the commissioner of docks shall have exclusive power to regulate the use of marginal streets so that the land and buildings upon all such marginal streets may be used to the best advantage in connection with the wharves and bulkheads; and the commissioner of docks shall have power to regulate by license or by any other suitable means, the transfer of goods and merchandise upon, over or under all such marginal streets.

In and by chapter 809 of the Laws of 1920, the Greater New York

charter was amended by adding section 819-a thereto so as to provide that it shall be lawful for the commissioner of docks, with the approval of the commissioners of the sinking fund, to erect and maintain within the lines of and upon any marginal street, wharf or place now constructed or which may hereafter be constructed, sheds, warehouses, coal pockets and other buildings and structures devoted to commercial uses in connection with the adjacent piers and bulkheads.

Exterior street between Rivington street on the south, Stanton street on the north and Tompkins street on the west and west of the bulkhead line of the East river is a marginal street within the meaning of the provisions of the Greater New York charter, to be used in connection with wharves and piers for the commercial uses to which such wharves and piers are devoted and not otherwise, and the only structures permitted by law to be erected and maintained within the lines of and upon said marginal street are sheds, warehouses, coal pockets and other buildings and structures devoted to commercial uses in connection with the adjacent piers and bulkheads, and any other use of said street or the erection of any structure or structures, other than those mentioned above, would be unlawful, and any contract entered into for the erection thereof would be without power and wholly illegal and void.

On February 20, 1925, the board of estimate and apportionment of the city of New York approved forms, contracts, plans and specifications for the construction and equipment of a destructor plant for the burning of garbage and refuse at Tompkins, Rivington and Stanton streets and the East river, to be constructed under the jurisdiction of the department of plant and structures.

Acting in alleged compliance with said resolution last referred to, the defendant Mills, as commissioner of plant and structures of the city of New York, advertised for bids for four contracts covering the construction of the so-called destructor plant, to be located at Tompkins, Rivington and Stanton streets and the East river in the borough of Manhattan, bids to be submitted to him on May 15, 1925, at two o'clock ᴘ. ᴍ. Said bids for said destructor plant were so received and opened by the said commissioner of plant and structures on said date and at said time. Contracts for the construction of said destructor plant did not intend or provide for any construction or erection for commercial uses or purposes nor for any erection or construction upon the marginal way or exterior street on the west side of the East river between Rivington street and Stanton street, permitted within the provisions of the charter of the city of New York and laws applicable thereto.

The structures, erections and buildings proposed to be erected

as a destructor plant under the bids received, as alleged in the last preceding paragraph, are as provided in the plans and specifications therefor, to be erected upon and wholly upon the said marginal street or exterior street on the west side of the East river between Rivington street and Stanton street.

Purporting to act in alleged compliance with the resolution and advertisement for bids hereinbefore referred to, the defendant Mills, as commissioner of plant and structures of the city of New York, intends to and is about to award and enter into contracts for the erection of the destructor plant hereinbefore referred to according to the aforesaid plans and specifications as annexed to said proposed contracts and to proceed to build and erect said destructor plant on the marginal way or exterior street on the west side of the East river between Rivington street on the south and Stanton street on the north in the borough of Manhattan, city and county of New York.

It is then averred that unless restrained by an order of this court, the said defendants will proceed to take action on the bids received by the commissioner of plant and structures, and the defendant Mills, as commissioner of plant and structures, will proceed to award and make and enter into contracts for the erection and construction of said destructor plant with the successful bidders for said contracts, and the defendant Craig, as comptroller of the city of New York, will proceed to register said contracts, and said defendants Mills, as commissioner of plant and structures of the city of New York, and the city of New York will proceed with the erection of said destructor plant, which action by said defendants would be wholly and absolutely without power and constitute illegal official acts within the meaning of the Taxpayers' Statute,* the statutes of the State of New York and the charter of the city of New York, and would result in a fraud upon and in a great injury to the city of New York and in the unlawful waste and injury to its estate.

Alleging that plaintiff has no other remedy at law or in equity, plaintiff asks for a judgment (1) permanently enjoining and restraining the defendants from taking any further action in the premises, awarding contracts to the successful bidders for the construction of the destructor plant hereinbefore referred to, making and entering into contracts for the construction thereof, registering said contracts or proceeding with the performance of said contracts; and permanently enjoining and restraining the defendant, as commissioner of plant and structures, from awarding contracts for the

---

* See Gen. Mun. Law, § 51.— [REP.

construction of radial brick chimneys, automobile truck elevators, furnaces, flues and mechanical equipment, and for the construction of a destructor plant or any part thereof on a marginal street or exterior street aforesaid, and from entering into written contracts therefor or for the construction of any part thereof in said location, from taking any action under the advertisement and from in anywise acting or attempting to act in the making or performance of the contract; also enjoining the comptroller from registering any contract as aforesaid; and permanently enjoining the city of New York from proceeding to construct the destructor plant on the aforesaid location.

The answer of the defendants, after denials of certain allegations of the complaint, avers: " That the marginal way or Exterior Street referred to in the complaint is not a public street but a marginal wharf, street or place and has, pursuant to the provisions of section 836 of The Greater New York Charter, been duly set aside as a suitable and sufficient wharf and bulkhead for the use of the Department of Street Cleaning of The City of New York and that upon such marginal wharf so set aside, it is proposed to erect the incinerator described in the complaint."

The first contention of the plaintiff is that the commissioner of plant and structures was wholly without power to advertise for the construction of a proposed destructor plant upon the marginal or exterior street fronting the East river between Rivington and Stanton streets and the entering into of contracts therefor would be in direct violation of section 819 of the Greater New York charter as construed by this court in *Vilias* v. *Featherson* (94 App. Div. 259).

Section 819 of the Greater New York charter, as amended by the Laws of 1913, chapter 327, provides: " The commissioner of docks shall have exclusive power to regulate the use of marginal streets so that the land and buildings upon all such marginal streets may be used to the best advantage in connection with the wharves and bulkheads; and the commissioner of docks shall have the power to regulate, by license or by any other suitable means, the transfer of goods and merchandise upon, over or under all such marginal streets; except that the said commissioner of docks shall not, under this section, have any power in respect to, or jurisdiction over, the public driveway authorized by and constructed under chapter one hundred and two of the laws of eighteen hundred and ninety-three and acts amendatory thereof."

On April 3, 1807, the Legislature passed chapter 115 of the Laws of that year which authorized and directed the Commissioners of the Land Office to grant by letters patent to the mayor, aldermen

and commonalty of the city of New York all the right and title of
the People of the State of New York to the lands covered by water
along the westerly shore of the East river contiguous to and adjoin-
ing the lands of the city at and from low-water mark and extending
400 feet into the East river from the north side of Corlear's Hook
to the distance of two miles to the north along the westerly shore
of the East river. That statute covered the location involved in
the present suit.

Section 220 *et seq.* of chapter 86 of the Revised Laws of 1813,
being the New York City Charter of 1813 (2 R. L. 432) authorized
the mayor, aldermen and commonalty to lay out streets or wharves
of the width of seventy feet in front of those parts of the city
which adjoined the East river or sound, etc., and provided for the
extension of such streets or wharves as the buildings of the city
should be extended along the river or sound.

By chapter 58 of the Laws of 1826 the Legislature enacted
" That Tompkin's-street along the East river, as laid out and
approved of by the mayor, aldermen and commonalty of the city
of New-York, shall be the permanent exterior street on the East
river, between Grand-street and Twenty-third-street   *   *   *."

Thus, as early as 1826, Tompkins street between Grand street
and Twenty-third street was laid out and adopted as an exterior
street. Upon such enactment and the subsequent maps for the
improvement of the water front, the plaintiff bases his claim that
the location involved in the present action has been for many
years an exterior or marginal street within the intent and meaning
of section 819 of the Greater New York charter. By chapter 166
of the Laws of 1826 (repealing Laws of 1826, chap. 58, § 2, *supra*)
it was enacted that Tompkins street should be the exterior street
on the East river between Rivington street and Twenty-third street,
and that East street should be the exterior street on the said river,
between Grand street and Rivington street. (See, also, *Matter of
City of New York*, 213 App. Div. 187, 193, 196.)

This contention that Tompkins street at the point in question is
a marginal street is admitted by the answer.

In *Vilias* v. *Featherson* (94 App. Div. 259) section 819 of the
Greater New York charter before quoted was under consideration
by this court, as well as the whole question of the use to which
marginal streets could lawfully be put.

Mr. Justice INGRAHAM there said (at p. 264): " These marginal
streets were evidently intended to be a continuation or extension
of the dock system, and it was recognized that they necessarily
would at times be obstructed by merchandise removed from ships
or to be loaded upon ships at the wharves and by the necessary

machinery used for loading and unloading ships and the other general uses to which wharf property is usually put. If these wharf streets were to be used in this connection, with the adjoining wharves or bulkheads, it would be quite impossible to keep them free from the obstructions and incumbrances which would not be allowed in the usual public streets. It certainly, however, was not intended by these provisions of the charter to authorize the dock commissioner to cause the marginal streets to be built on by permanent structures to be used for business purposes distinct from the wharfs or bulkheads, as it seems to me that such authority would be opposed to the whole intent of the Legislature as shown by the various provisions of the charter. While a new street or avenue along the water front was not to be a public street, it was to be a marginal wharf to be used, not generally as the commissioner should direct, but as a marginal wharf for wharf or bulkhead purposes; and the further provision of section 819 of the charter that the commissioner of docks should have the exclusive power to regulate the use of marginal streets so that the land and buildings upon all such marginal streets might be used to the best advantage, in connection with the wharves and bulkheads, did not refer to the land and buildings in the marginal streets, but to the abutting land and buildings, thus emphasizing the intention that these streets should be so used in connection with the wharves and the abutting land and buildings thereon as would best conserve the general purposes of commerce. For that purpose, undoubtedly, the commissioner could authorize the construction of machinery for loading and unloading ships, and carrying the merchandise therefrom to the adjoining property, although such a use would be inconsistent with a strict street use. But there is nothing in this section which would justify the commissioner in appropriating these marginal streets for purposes other than commercial purposes in connection with the wharves and bulkheads or piers which were adjacent to them; and so we see that section 825 of the charter (as amd. by Laws of 1902, chap. 609) provides that when the wharves, piers, bulkheads, slips, docks and basins shall be opened to the public the commissioner of docks shall regulate the charges for wharfage, cranage and dockage of all vessels admitted thereto, and may lease any or all of such property, or any and all wharf property belonging to the city. This provision to lease was not intended to authorize a lease of the marginal streets for purposes not connected with the dock property. But as provided in section 819 of the charter, such marginal streets were to be used as a marginal wharf and not for other business, entirely disconnected with the wharves or piers. The charter is speaking of the power conferred upon the depart-

ment of docks and ferries, and the authority given to the head of that department in relation to the management of the docking facilities of a commercial seaport, in connection with the duties which devolve upon him in charge of such department and in charge of the wharves, piers and bulkheads connected with the commercial interest of the city. He is given authority to lease the wharves and piers and incidental authority in connection with such leases to control the marginal streets which are adjacent to such piers and bulkheads. In conferring that power, there was no authority to lease any of the docks or marginal streets for purposes not connected with the uses of wharves, piers and bulkheads. I apprehend that if the commissioner should lease for ten years the whole of one of these streets for a large office building, or for private business purposes, such a lease would be clearly beyond his power; and yet if he is authorized to lease a portion of one of these marginal streets for the selling of flowers, and tobacco, I can see no reason why he would not also be authorized to lease the whole of such a street for the erection of a permanent building. These marginal streets became a part of the wharf system of the city, to be used in connection with wharves and piers for the commercial uses to which such wharves and piers are devoted; and for such commercial purposes the wharves and piers can undoubtedly be leased, and the use of the marginal street, in connection with the wharf and pier thus leased, authorized by the commissioner. But the power of the commissioner, it seems to me, is restricted to such a use of the marginal street; and he has no authority to divert these marginal streets from use in connection with the wharves and piers which the statute plainly implies."

This decision was a clear and unequivocal holding that the only use to which marginal streets can be put is the commercial use to which docks and piers are devoted, and in connection with which such streets are to be used. These wharves and piers can be leased for commercial purposes, and the use of the marginal street in connection with the wharf and pier thus leased can be authorized by the commissioner of docks. But such use must be a commercial one. I am of the opinion that the appellant is correct in his contention, under the decision in the *Vilias* case, that the city cannot grant the use of its marginal streets, wharves or ways for non-commercial purposes not connected with the wharves, docks or piers for the reason that by the express provisions of the city charter, such streets or ways are intended to be preserved and used for the benefit of all the citizens and inhabitants of the city in connection with the dock system provided for by chapter 16 of the Greater New York charter. As a necessary corollary the city itself cannot

appropriate, take and use such marginal streets or any part or portion thereof for non-commercial purposes not connected with the adjacent wharves and piers.

That this decision in the *Vilias* case was accepted as settling the limitation of the use of exterior streets to commercial purposes in connection with the adjoining wharves and piers is demonstrated by chapter 809 of the Laws of 1920, which added a new section to the Greater New York charter, known as 819-a, providing as follows: " It shall be lawful for the commissioner of docks with the approval of the commissioners of the sinking fund to erect and maintain within the lines of and upon any marginal wharf, street or place now constructed or which may hereafter be constructed, sheds, warehouses, coal pockets and other buildings and structures devoted to commercial uses in connection with the adjacent piers and bulkheads. The work of such construction shall be performed in the manner provided by section eight hundred and twenty-one of this act. With the approval of the commissioners of the sinking fund it shall also be lawful for the commissioner of docks to lease any portion of any such marginal wharf, street or place in the manner provided by section eight hundred and twenty-five of this act, and to authorize the lessee under any such lease to erect and maintain upon the premises so demised sheds, warehouses, coal pockets or other buildings or structures devoted to commercial uses in connection with the adjacent piers and bulkheads."

Therefore, while realizing the importance for the public health and comfort of the maintenance of destructors or incinerators, used for the burning of garbage and refuse, I am of the opinion that the use of an exterior street for such a purpose, not being a commercial one, is unlawful and cannot be upheld.

The city also relies upon the provisions of the Greater New York charter which confer upon the commissioner of street cleaning cognizance and control of the removal or other disposition of ashes, street sweepings, garbage and other light refuse and rubbish (Greater N. Y. Charter, § 534, as amd. by Laws of 1911, chap. 680). In connection with this, section 542 of the Greater New York charter (as amd. by Laws of 1915, chap. 500) confers upon the city official having the management and control of the public docks, piers and slips, power to designate suitable and sufficient slips, piers and berths in slips for the use of the street cleaning commissioner and the borough presidents of Queens and Richmond. Such powers having been conferred, the city contends that section 836 of the Greater New York charter confers power on the commissioner of docks to set aside an exterior street for use in connection with departmental purposes. But that section reads as follows:

" § 836. The commissioner of docks shall designate and set apart for the use of the department of street cleaning, the board of health, and other city departments, suitable and sufficient wharves, piers, bulkheads, slips and berths in slips for the use of said departments."

It will be seen that this section only confers upon the commissioner of docks power to set aside wharves, piers, bulkheads, slips and berths in slips for the use of the departments. Nothing whatever is said therein as to the use of an exterior street for such purposes. Section 836 is a part of the Greater New York charter of 1897 (Laws of 1897, chap. 378) as originally passed, and as revised and amended in 1901. It found its source in section 728 of the New York City Consolidation Act (Laws of 1882, chap. 410, as amd. by Laws of 1893, chap. 397). Obviously this section has no application to marginal or exterior streets. It was in effect at the time of the decision in the *Vilias* case, and was not deemed controlling as to the use of marginal or exterior streets solely for commercial purposes.

Even assuming that the commissioner of docks, under section 836 of the Greater New York charter, with the approval of the commissioners of the sinking fund under section 818 of the Greater New York charter (as amd. by Laws of 1918, chap. 515), would have the right to permit the portion of the marginal or exterior street in question to be used for a non-commercial purpose in connection with the wharves and docks adjacent thereto, the necessary approval of such action by the commissioners of the sinking fund was not given because the comptroller, though present, did not vote for the approval of such permission and, therefore, no legal consent was ever given to such use by the commissioners of the sinking fund.

The fact that the comptroller, though present, did not vote in favor of the resolution of the commissioners of the sinking fund approving the action of the commissioner of docks in setting aside a part of the exterior street in question for the use of the department of street cleaning, is shown by the affidavit of William H. O'Brien who refers to the minutes of the meeting of the commissioners held on April 16, 1925, when such approval was sought to be given, and is not controverted by defendants.

That the affirmative vote of the comptroller was necessary to the legal approval under section 818 of the Greater New York charter by the commissioners of the sinking fund of the action of the commissioner of docks, is supported by the following cases: In *Craig* v. *Commissioners of Sinking Fund* (208 App. Div. 412) it was held by this court that a resolution of the sinking fund commission

amending a prior resolution by striking out a portion which directed that a sale of certain buildings be carried out under the direction of the comptroller, and that such sale should take place under the direction of the city chamberlain, was illegal where it was adopted by the commissioners of the sinking fund at a special meeting at which the comptroller was not present. Mr. Justice MARTIN, writing for this court, said that the ordinance of February 22, 1844, which was still in full force and effect, was a re-enactment of the earlier ordinance of May 5, 1817 (save for the substitution of four members of the sinking fund commission to constitute a quorum, instead of three), and required the presence and action of the comptroller in order to make the resolution legal (see p. 416). Attention may also be called to section 3 of article 1 of chapter 2 of the Code of Ordinances of the City of New York, wherein the existing revision of the ordinance of 1844 may be found. (See Cosby's Code of Ordinances [Anno. 1925], p. 15.)

In *Matter of Ashmead* (N. Y. L. J. March 13, 1925) Mr. Justice CROPSEY at Special Term, Kings county, citing and following the decision of this court in the preceding case, held that a lease approved by the commissioners of the sinking fund, which approval did not receive the affirmative vote of the comptroller, was invalid. The pertinent part of his opinion is as follows: " The defense is in part that the lease which is claimed to be the basis of this original application is not valid and was not executed by lawful authority, as it was never approved by the commissioners of the sinking fund. There is a certificate stating that the lease was approved by those commissioners, but the fact is asserted and not denied that the comptroller did not vote for its approval, and without such vote, no approval of the lease could legally be given. (*Craig* v. *Commissioners of Sinking Fund of City of N. Y.*, 208 App. Div. 412.) The lease, therefore, has never been approved."

I find no holding contrary to these decisions in *Matter of Craig* v. *Matthews* (238 N. Y. 88).

It follows that the order appealed from should be reversed, with ten dollars costs and disbursements, and the motion for a temporary injunction granted, with ten dollars costs.

CLARKE, P. J., MERRELL and McAVOY, JJ., concur; BURR, J., dissents.

Order reversed, with ten dollars costs and disbursements, and motion granted, with ten dollars costs. Settle order on notice.